**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **PARK PLACE MASTER TENANT, LLC, d/b/a HOTEL CONSTANCE PASADENA f/k/a DUSITD2 HOTEL CONSTANCE, on behalf of itself and all others similarly situated,**<br><br>**Plaintiff,**<br><br>vs.<br><br>**ZURICH NORTH AMERICA, and ZURICH AMERICAN INSURANCE COMPANY,**<br><br>**Defendants.** | **Case No. 1:21-cv-02471** |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff, PARK PLACE MASTER TENANT, LLC, d/b/a HOTEL CONSTANCE PASADENA, f/k/a DUSITD2 HOTEL CONSTANCE ("Park Place" or "Plaintiff"), brings this Class Action Complaint, on behalf of itself, and on behalf of all others similarly situated (the "Class"), against Defendants, ZURICH NORTH AMERICA, and AMERICAN ZURICH INSURANCE COMPANY (collectively, the "Defendants"), alleging as follows:

## <u>NATURE OF THE CASE</u>

1. This is a civil class action for declaratory relief and breach of contract arising from Plaintiff's contract of insurance with the Defendants.

2. At the direction of local, state, and/or federal authorities, and/or due to the COVID-19 public health emergency, Plaintiff received a drastic number of reservation cancellations at Hotel Constance Pasadena (the "Hotel"), which constructively closed the Hotel, causing an interruption to, and loss of, Plaintiff's business income.

3. Plaintiff and the Class purchased and paid for an "all-risk" Commercial Insurance Policy from Defendants, which provides, in part, broad property insurance coverage for all non-excluded, lost business income, including the losses asserted herein.

4. Plaintiff submitted timely notice of its claim to Defendants, but Defendants have refused to provide the purchased coverage to its insured, and has denied Plaintiff's claim for benefits under the Policy.

5. Defendants have similarly refused to, or will refuse to, honor its obligations under the "all-risk" policy(ies) purchased by the other members of the putative Class of insureds.

## PARTIES

6. Plaintiff, Park Place Master Tenant LLC, is a limited liability company organized under the laws of the State of California and with its principle place of business in California. Park Place operates Hotel Constance Pasadena located at 928 East Colorado Boulevard, Pasadena, California 91106.

7. Defendant, Zurich North America ("Zurich NA") is a wholly-owned subsidiary of Zurich Insurance Group AG. Zurich NA is one of the largest providers of insurance solutions in the United States and Canada, and is incorporated and has its principal place of business in Illinois. Defendant Zurich American Insurance Company ("Zurich AIC") is a wholly-owned subsidiary of Zurich NA. Zurich AIC offers property and casualty insurance to clients in the United States, and is incorporated and has its principal place of business in Illinois.

## JURISDICTION

8. This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act because Plaintiff (and some members of the Class) and Defendants are citizens of different states, there are more than 100 members of the Class, and the

aggregated claims of the putative Class members exceed $5,000,000, exclusive of interest and costs.

9.     The Court has personal jurisdiction over Defendants because they are citizens of Illinois.

10.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because Defendants reside in this District and are citizens of the state in which this District is located.

## FACTUAL BACKGROUND

### Plaintiff Purchased an "All-Risk" Insurance Policy That Broadly Provides Coverage for Loss of Business Income, Among Other Things

11.    Plaintiff purchased a contract of insurance from Defendants, whereby Plaintiff agreed to make payments in the form of premiums to Defendants in exchange for Defendants' promise to indemnify Plaintiff for losses at the Covered Properties, including, but not limited to, business income losses.

12.    Plaintiff's contract of insurance with Defendants bears Policy Number CPO5538547-03 (the "Policy") and is effective for the period of July 31, 2019 to July 31, 2020 (the "Policy Term"). Plaintiff's Policy is attached hereto as **Exhibit A**.

13.    The Policy provides coverage to Plaintiff's property located at 928 East Colorado Boulevard, Pasadena, California 91106 (the Hotel), 25 E. Foothill Boulevard, Third Floor, Arcadia, California 91006, and 2 N. Lake Avenue, Penthouse, Pasadena, California 91101 (collectively, the "Covered Properties").

14.    Plaintiff paid all premiums owed to Defendants under its Policy, and Defendants accepted all such premiums from Plaintiff.

15.    Plaintiff's Policy is a form policy issued by Defendants.

16.     The Policy is an "all-risk" policy, which provides the broadest property insurance coverage available.

17.     The Policy provides coverage for "direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss."

18.     The premises as described in the Declarations are the Covered Properties, as defined above, which includes the Hotel.

19.     The Policy describes "Covered Cause of Loss" as "direct physical loss unless the loss is excluded or limited in this policy."

20.     The Policy does not define the phrase "direct physical loss of or damage to."

21.     However, the use of the disjunctive "or" in the phrase "direct physical loss of or damage to" means that coverage is triggered if either a direct physical loss of Covered Property or damage to Covered Property occurs. The concepts are separate and distinct and cannot be conflated.

22.     Physical loss of, or damage to, property may be reasonably interpreted to occur when a covered cause of loss threatens or renders property unusable or unsuitable for its intended purpose or unsafe for ordinary human occupancy and/or continued use.

23.     The Policy provides Plaintiff with, *inter alia*, various business income and extra expense coverages during the Policy Term.

24.     Under the Policy, Defendants agree to pay for the actual loss of "Business Income" sustained by Plaintiff due to the "necessary 'suspension' of your 'operations' during the 'period of restoration.' The 'suspension' must be caused by direct physical loss of or damage to property at

premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations."

25.     The Policy describes the premises as the Covered Properties, with a Limit of Insurance for "Blanket Business Income w/ Extra Expense" of $14,000,000.

26.     Additional coverage is provided under the Policy for business income losses resulting from an "action of civil authority" which prohibits access to the Covered Properties, related to a "Covered Cause of Loss" at property other than the Covered Properties.

27.     The Policy also provides coverage for "actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration,'" caused by direct physical loss or damage to "dependent property" "caused by or resulting from a Covered Cause of Loss." Dependent property is defined as "property operated by others whom you depend on to: a) Deliver materials or services. . . b) Accept your products or services. . .  c) Manufacture products for delivery to your customers under contract of sale. . . or d) Attract customers to your business . . . ."

28.     Members of the Class also purchased a policy from Defendants providing for the same business income loss and civil authority and dependent property coverage, and using the same form policy provisions.

### In Response to Covid-19, State Governments, including California, Issued Sweeping Orders Shutting Down "Non-Essential" Businesses and Prohibiting Public Gatherings

29.     COVID-19 has spread, and continues to spread, rapidly across the United States and has been declared a public health emergency of international concern by the World Health Organization ("**WHO**").[1]

---

[1] *See* https://www.health.harvard.edu/diseases-and-conditions/coronavirus-resource-center (last accessed June 22, 2020).

30.     COVID-19 is highly contagious and can be spread exponentially in the community by persons who are symptomatic, asymptomatic or pre-symptomatic. In addition to transmission through airborne respiratory droplets, the COVID-19 virus can physically attach to and stay on surfaces of objects or materials for many days.

31.     According to a study published in *The New England Journal of Medicine*, COVID-19 is widely accepted as a cause of real physical loss and damage. It remains stable and transmittable in aerosols for up to three hours, and on surfaces for up to four hours on copper, up to 24 hours on cardboard, and up to two to three days on plastic and stainless steel.[2]

32.     Another study, published in the *Journal of Hospital Infection*, found: "Human coronaviruses can remain infectious on inanimate surfaces at room temperature for up to 9 days. At a temperature of 30°C or more the duration of persistence is shorter."[3]

33.     In response to the COVID-19 pandemic, on March 4, 2020, California Governor, Gavin Newsom, declared a State of Emergency for California.[4]

34.     On March 16, 2020, the Centers for Disease Control and Prevention ("**CDC**") issued national guidance to "slow the spread" of COVID-19, suggesting that people should avoid gatherings of 10 or more people.[5]

---

[2] *See* https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces (last accessed June 22, 2020).

[3] *See* https://www.inverse.com/science/coronavirus-4-studies-explain-how-covid-19-sticks-to-surfaces (last accessed June 22, 2020).

[4] https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf (last accessed July 6, 2020).

[5] Coronavirus disease 2019 (COVID-19): recommendations regarding the use of cloth face coverings, especially in areas of significant community-based transmission. Atlanta, GA: US Department of Health and Human Services, CDC; 2020. https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html

35.     Also on March 16, 2020, the Pasadena City Manager Steve Mermell proclaimed a Local State of Emergency in order to "empower the City to more effectively respond to [] COVID-19."[6]

36.     On March 19, 2020, the Health Officer of the City of Pasadena, Ying-Ying Goh, issued a "Safer at Home Order for Control of COVID-19,"[7] which prohibited gatherings of 10 or more people, and closed non-essential businesses in the City of Pasadena.

37.     On March 19, 2020, Governor Newsom issued a statewide stay-at-home order,[8] which required "all individuals living in the State of California to stay at home or at their place of residence."

38.     On March 22, 2020, Health Officer Goh issued a revised Safer at Home Order, which incorporated Governor Newsom's stay at home order.[9]

39.     On May 7, 2020, Governor Newsom issued an order[10] permitting a gradual statewide movement from Stage 1 to Stage 2, which entails a slow reopening of the State of California on a county by county basis.[11]

40.     On May 22, 2020, the County of Los Angeles Department of Public Health issued an order to "partially move the County of Los Angeles into Stage 2," and allowed the operation of

---

[6] *See* https://www.cityofpasadena.net/city-manager/news-releases/proclamation-of-local-emergency-issued-to-prevent-the-spread-of-covid-19/ (last accessed July 6, 2020).

[7] *See* https://www.cityofpasadena.net/city-manager/wp-content/uploads/sites/2/City-of-Pasadena-Safer-at-Home-Order-for-Control-of-COVID-19-1.pdf?v=1593716466560 (last accessed July 6, 2020).

[8] *See* https://www.gov.ca.gov/wp-content/uploads/2020/03/3.19.20-attested-EO-N-33-20-COVID-19-HEALTH-ORDER.pdf (last accessed July 6, 2020).

[9] *See* https://www.cityofpasadena.net/city-manager/wp-content/uploads/sites/2/SAFER-AT-HOME-ORDER-FOR-CONTROL-OF-COVID19-REVISED.pdf?v=1593716466560 (last accessed July 6, 2020).

[10] *See* https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/SHO%20Order%205-7-2020.pdf (last accessed July 6, 2020).

[11] *See* https://www.gov.ca.gov/wp-content/uploads/2020/05/5.4.20-Update-on-Californias-Pandemic-Roadmap.pdf (last accessed July 6, 2020).

low-risk businesses, but encouraged residents to continue to work remotely, continue to remain in their residence, and continue not to operate unless you are an essential or low-risk business.

41.     In response to the CDC guidance and orders provided by Governor Newson, City Manager Mermell, and Health Officer Goh, lodging establishments, such as the Hotel, were constructively closed to the public in order to prevent any gatherings of 10 or more people in the lobby, restaurants, bars, or other common areas. "Hotels and lodging establishments for leisure and tourism are higher-risk workplaces and therefore are part of [California's] Stage 3."[12]

42.     The County of Los Angeles and State of California are continuing to operate under modified Stay at Home Orders, with plans on gradually reopening over time to minimize the spread of COVID-19.

43.     The County of Los Angeles currently allows hotels to operate "with caution and adhere to [certain] requirements. . . ."[13]

44.     The American Hotel & Lodging Association indicated that, as of June 24, 2020, 6 out of 10 open hotel rooms were empty across the country and that, since mid-February, hotels in the U.S. have already lost approximately $40 billion in revenue.[14]

45.     It is reported that the hotel industry is one of the hardest hit by COVID-19, and that "recovery to pre-COVID-19 levels could take until 2023 – or later."[15]

46.     Most other states, including those in which the putative Class members reside and/or do business, have issued similar compulsory shut-down orders for "non-essential"

---

[12] Fisher Phillips, "*What Hotels Need to Know About California's Reopening Plan*" (M17 12, 2020), https://www.jdsupra.com/legalnews/what-hotels-need-to-know-about-64950/
[13] http://publichealth.lacounty.gov/media/coronavirus/docs/protocols/Reopening_LodgingShortTermRentals.pdf
[14] *See* https://www.ahla.com/covid-19s-impact-hotel-industry (last accessed July 6, 2020).
[15] Vic Krishnan, "*Hospitality and COVID-19*," (June 10, 2020) https://www.mckinsey.com/industries/travel-logistics-and-transport-infrastructure/our-insights/hospitality-and-covid-19-how-long-until-no-vacancy-for-us-hotels

businesses, or businesses deemed not to be "life sustaining," and have otherwise prohibited gatherings of 10 or more people.

47.   The closure of all non-life-sustaining businesses and prohibition of gatherings evidences an awareness on the part of both state and local governments that COVID-19 spreads easily and causes loss of or damage to property.  This is particularly true in places where in-person business is conducted or large gatherings are inevitable, as the contact and interaction necessarily incident to such businesses causes a heightened risk of the property becoming contaminated.

48.   For example, a New York City Executive Order entered on March 16, 2020 specifically acknowledged that: "[COVID-19] physically is causing property loss and damage."[16]

49.   Similarly, in a March 16, 2020 proclamation, the City of New Orleans acknowledged COVID-19's "propensity to attach to surfaces for prolonged periods of time, thereby spreading from surface to person and causing property loss and damage in certain circumstances."[17]

50.   In upholding the Governor of Pennsylvania's Proclamation of a state-wide disaster and the Executive Orders mandating the closure of businesses within Pennsylvania, the Pennsylvania Supreme Court noted the significant risk of the spread of the COVID-19 virus, even in locations where the disease has not been detected:

> Covid-19 does not spread because the virus is "at" a particular location. Instead it spreads because of person-to-person contact, as it has an incubation period of up to fourteen days and that one in four carriers of the virus are asymptomatic. Respondents' Brief at 4 (citing Coronavirus Disease 2019, "Symptoms," CDC, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last accessed 6/23/2020)). The virus can live on surfaces for up to fourteen days

---

[16] *See* https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-100.pdf (last accessed July 6, 2020).

[17] *See* https://nola.gov/mayor/executive-orders/emergency-declarations/03162020-mayoral-proclamation-to-promulgate-emergency-orders-during-the-state-of-emergency-due-to-co/ (last accessed July 6, 2020).

and can remain in the air within confined areas and structures. *Id.* (citing National Institutes of Health, "Study suggests new coronavirus may remain on surfaces for days," (Mar. 27, 2020) https://www.nih.gov/news-events/nih-research-matters/study-suggests-new-coronavirus-may-remain-surfaces-days (last accessed 4/9/2020) and Joshua Rabinowitz and Caroline Bartman, "These Coronavirus Exposures Might be the Most Dangerous," The New York Times (Apr. 1, 2020) https://www.nytimes.com/2020/04/01/opinion/coronavirus-viral-dose.html).

*Friends of DeVito v. Wolf*, 227 A.3d 872, 891 (Pa. 2020).

51.     Because COVID-19 virus can survive on surfaces for up to fourteen days, the Pennsylvania Supreme Court ultimately concluded that "any location . . .  where two or more people can congregate is within the disaster area." *Id.*

52.     Further, the WHO has indicated that airborne transmission, "particularly in specific indoor locations, such as crowded and inadequately ventilated spaces" poses a significant risk.[18]

53.     The CDC warned that exposure to an individual with COVID-19 for fifteen minutes or more, or close contact within six feet of distance, is enough to justify a personal quarantine.[19]

### Plaintiff Submitted a Claim Under Its "All-Risk" Policy, and Defendants Wrongly Failed and Refused To Honor Its Obligations Respecting Same

54.     As a result of the orders, guidance and protocols issued by the Governor of California, the County of Los Angeles Department of Public Health, Health Officer Goh, and the CDC (collectively the "**Mandated Shutdown Rules**"[20]), the Hotel received a significant number of Hotel reservation cancellations, and effectively closed on March 16, 2020 in order to prevent the gathering of 10 or more people and stop the spread of COVID-19.

55.     Plaintiff has incurred, and will continue to incur, among other things, a substantial loss of business income, including additional expenses covered under the Policy due to the

---

[18] https://apnews.com/648feb226473f9841920abd6ffb004c7
[19] https://www.cdc.gov/coronavirus/2019-ncov/php/public-health-recommendations.html
[20] Included in this definition when referring to the Class is all other State, County and Department of Health orders, guidance and protocols under which members of the Class operated.

constraints placed on businesses and public places such as the Covered Properties because of the Mandated Shutdown Rules.

56.     On April 2, 2020, Plaintiff provided timely notice to Defendants of its claim for the loss of business income due to COVID-19 and the Mandated Shutdown Rules. Plaintiff's April 2, 2020 claim is attached hereto as **Exhibit B**.

57.     On April 30, 2020, Defendants responded to Plaintiff indicating that they are currently investigating the claims, but effectively denied such claims by stating, "[h]ere it does not appear that any loss resulting from the presence of the COVID-19 virus is a 'Covered Cause of Loss,'" and that the Policy's "Virus" Exclusion applies to COVID-19, which bars Plaintiff's claims. Defendants' April 30, 2020 response is attached hereto as **Exhibit C**.

### Contrary To Defendant's Position, Plaintiff's Losses Arise From A Covered Cause of Loss

58.     Plaintiff's suffered "direct physical loss of or damage to" the Hotel due to the Mandated Shutdown Rules.  The Mandated Shutdown Rules, in and of themselves, constitute a Covered Cause of Loss within the meaning of the Policy.

59.     Alternatively, and to the extent the Mandated Shutdown Rules do not constitute a Covered Cause of Loss within the meaning of the Policy, the COVID-19 public health emergency and the ubiquitous nature of the COVID-19 virus caused a direct physical loss or damage to Plaintiff's Covered Properties. Specifically, the Covered Property has been rendered unusable for its intended purpose because the highly contagious nature of COVID-19 – particularly when people gather inside a building or other closed space for extended periods of time, or when aerosols are generated during medical procedures – precludes any meaningful use of the Covered Property. For example, in *Motorists Mutual Ins. Co. v. Hardinger*, 131 F. App'x 823 (3d Cir. 2005), the United States Court of Appeals for the Third Circuit held that an issue of fact existed as to whether

the presence of Escherichia coli ("E. coli") at the covered property impacted its functionality, or made the property otherwise useless or uninhabitable, sufficient to establish physical loss or damage to the property.

60.     Further, and as an additional basis for coverage under the Policy, the ubiquitous nature of the COVID-19 virus caused direct physical loss or damage to property other than Plaintiff's Covered Properties, and such loss or damage resulted in an "action by civil authority" prohibiting access to Plaintiff's Covered Properties, within the meaning of the Policy.

61.     Additionally, Plaintiff's "dependent property" suffered direct physical loss or physical damage as a result of the Mandatory Shutdown Rules, or in the alternative, the ubiquitous nature of the COVID-19 virus, resulting in lost business income to Plaintiff, within the meaning of the Policy.

## Contrary To Defendant's Position, The Virus Exclusion Does Not Apply

62.     The Policy contains a coverage exclusion for losses caused by "any virus, bacterium or other micro-organism that induces or is capable of inducing physical distress, illness or disease." (the "Virus Exclusion").

63.     The Virus Exclusion does not preclude coverage for Plaintiff's claim under the Policy.

64.     First, to the extent that the governmental orders, in and of themselves, constitute direct physical loss of or damage to Plaintiff's Covered Properties, the Virus Exclusion simply does not apply.

65.     Further, to the extent that the coverage under the Policy derives from direct physical loss or damage caused by the COVID-19 virus, either to Plaintiff's Covered Properties or to

property other than Plaintiff's Covered Properties, Defendants should be estopped from enforcing the Virus Exclusion, on principles of regulatory estoppel, as well as general public policy.

66.     In 2006, two insurance industry trade groups, Insurance Services Office, Inc. ("ISO") and the American Association of Insurance Services ("AAIS"), represented hundreds of insurers in a national effort to seek approval from state insurance regulators for the adoption of various virus exclusion provisions.

67.     In their filings with the various state regulators (including California), on behalf of the insurers, ISO and AAIS represented that the adoption of the virus exclusion provisions were only meant to "clarify" that coverage for "disease-causing agents" has never been in effect, and was never intended to be included, in the property policies.

68.     Specifically, in its "ISO Circular" dated July 6, 2006 and entitled "New Endorsements Filed to Address Exclusion of Loss Due to Virus or Bacteria," ISO represented to the state regulatory bodies that:

> While property policies have not been a source of recovery for losses involving contamination by disease-causing agents, the specter of pandemic or hitherto unorthodox transmission of infectious material raises the concern that insurers employing such policies may face claims in which there are efforts to expand coverage to create sources of recovery for such losses, contrary to policy intent.

69.     Similarly, AAIS, in its "Filing Memorandum" in support of the adoption of virus exclusion provisions, represented:

> Property policies have not been, nor were they intended to be, a source of recovery for loss, cost or expense caused by disease-causing agents.  With the possibility of a pandemic, there is concern that claims may result in efforts to expand coverage to create recovery for loss where no coverage was originally intended . . .

> This endorsement clarifies that loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress is excluded  . . .

70.     The foregoing representations made by the insurance industry were false.  By 2006, the time of the state applications to approve the virus exclusion provisions, courts had repeatedly found that property insurance policies covered claims involving disease-causing agents, and had held on numerous occasions that any condition making it impossible to use property for its intended use constituted "physical loss of or damage to" such property.

71.     The foregoing assertions by the insurance industry (including Defendants),  made to obtain regulatory approval of virus exclusion provisions, were in fact misrepresentations and for this reason, among other public policy concerns, insurers should now be estopped from enforcing the Virus Exclusion to avoid coverage of claims related to the COVID-19 pandemic.

72.     In securing approval for the adoption of virus exclusions by misrepresenting to the state regulators that such provisions would not change the scope of coverage, the insurance industry effectively narrowed the scope of the insuring agreement without a commensurate reduction in premiums charged.  Under the doctrine of regulatory estoppel, the Court should not permit the insurance industry to benefit from this type of duplicitous conduct before the state regulators.

73.     Upon information and belief, Defendants have denied, or will deny, other Class members' claims for coverage under their "all-risk" property damage policies issued by Defendants.

74.     Defendants' denial of lost business income claims has left Plaintiff and the Class without vital coverage acquired to ensure the survival of their businesses during this temporary suspension of operations.

## CLASS ACTION ALLEGATIONS

75.     Plaintiff brings this action individually and as a class action on behalf of the Class,

defined as follows:

> All policyholders in the United States who purchased commercial property
> coverage, including business income, extra expense and/or action of civil authority
> coverage from Defendants and who have been denied coverage under their policy
> for lost business income after being ordered by a governmental entity, in response
> to the COVID-19 pandemic, to shut down or otherwise curtail or limit in any way
> their business operations, or after having sustained a loss due to an action by civil
> authority.

76.     Excluded from the Class are Defendants and their officers, directors, legal

representatives, successors, subsidiaries, and assigns. Also excluded from the Class are any

judicial officer presiding over this matter, members of their immediate family, and members of

their staff.

77.     The members of the Class are so numerous and geographically dispersed that

joinder would be impracticable. Class members are readily identifiable from information and

records in Defendants' possession, custody, or control.

78.     There is a well-defined community of interest in the common questions of law and

fact affecting the Class members. These common legal and factual questions include, but are not

limited to:

> a.      whether Defendants owed coverage to Plaintiff and the Class;
>
> b.      whether any exclusions to coverage apply;
>
> c.      whether Plaintiff and members of the Class are entitled to damages and, if
> so, the measure of such damages; and
>
> d.      whether Plaintiff and members of the Class are entitled to equitable,
> declaratory and/or other relief, and if so, the nature of such relief.

79.     Plaintiff's claims are typical of the claims of the absent Class members and have a common origin and basis. Plaintiff and absent Class members are all injured by Defendants' refusal to afford the purchased coverage. Plaintiff's claims arise from the same practices and course of conduct giving rise to the claims of the absent Class members and are based on the same legal theories, namely the refusal to provide insurance coverage for the loss. If prosecuted individually, the claims of each Class member would necessarily rely upon the same material facts and legal theories and seek the same relief. Plaintiff's claims arise from the same practices and course of conduct that give rise to the other Class members' claims and are based on the same legal theories.

80.     Plaintiff will fully and adequately assert and protect the interests of the absent Class members and has retained Class counsel who are experienced and qualified in prosecuting class action cases similar to this one. Neither Plaintiff nor Plaintiff's attorneys have any interest contrary to or conflicting with the interests of absent Class members.

81.     The questions of law and fact common to all Class members predominate over any questions affecting only individual class members.

82.     A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the absent Class members' claims is economically infeasible and procedurally impracticable. Class members share the same factual and legal issues and litigating the claims together will prevent varying, inconsistent, or contradictory judgments, and will prevent delay and expense to all parties and the court system through litigating multiple trials on the same legal and factual issues. Class treatment will also permit Class members to litigate their claims where it would otherwise be too expensive or inefficient to do so. Plaintiff knows of no difficulties in managing this action that would preclude its maintenance as a class action.

83.     Additionally, the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants. Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class members and impair their interests. Defendants, through their uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making declaratory relief appropriate to the Class as a whole.

## COUNT I
## DECLARATORY RELIEF

84.     Plaintiff incorporates by reference Paragraphs 1 through 83 above as if fully set forth herein.

85.     The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that in "a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

86.     An actual controversy has arisen between Plaintiff and Defendants as to the rights, duties, responsibilities and obligations of the parties in that Plaintiff contends and Defendants dispute and deny that the Policy provides coverage to Plaintiff for any current and future lost business income, subject to the limit of liability, for the temporary suspension of Plaintiff's operations.

87.     The Policy provides coverage for "direct physical loss of or damage to Covered Property . . . caused by or resulting from any Covered Cause of Loss." The Policy does not define "direct physical loss of or damage to."

88.     Plaintiff's loss of use,  loss of access, and loss of functionality of its Covered Properties when the Mandated Shutdown Rules made it unlawful for Plaintiff to fully access, use, and operate their business at the Covered Properties, constitutes a "Covered Cause of Loss" under the Policy.  Alternatively, the ubiquitous nature of the COVID-19 virus caused a "Covered Cause of Loss" to the Covered Properties by preventing Plaintiff and the Class from using the Covered Properties for its intended purpose.

89.     Additionally, the Mandated Shutdown Rules or, alternatively, the ubiquitous nature of the COVID-19 virus, caused a "Covered Cause of Loss" to property other than the Covered Properties, thereby invoking coverage under the Policy's "Civil Authority" provision for "actual loss of Business  Income . . . caused by action of civil authority that prohibits access to the described premises."

90.     Further, the Mandatory Shutdown Rules, or alternatively, the ubiquitous nature of the COVID-19 virus, caused physical loss or physical damage to Plaintiff's "dependent property," thereby invoking coverage under the Policy's "Dependent Property" provision, which provides for the payment of lost Business Income when a Covered Cause of Loss damages "Dependent Property."

91.     The Policy constitutes a valid and binding agreement obligating Defendants to indemnify Plaintiff for covered losses.

92.     Plaintiff has substantially performed or otherwise satisfied all conditions precedent to bringing this action and obtaining coverage pursuant to the Policy and applicable law, or alternatively, Plaintiff has been excused from performance by Defendants' acts, representations, conduct, or omissions.

93.     Defendants have failed to indemnify Plaintiff for its covered losses.

94.     No exclusion to coverage applies.

95.     Plaintiff has suffered and continues to suffer a covered loss under the Policy.

96.     Plaintiff, individually and on behalf of the Class, seeks a Declaratory Judgment that there is coverage for its business interruption losses under the Policy.

**COUNT II**
**BREACH OF CONTRACT**

97.     Plaintiff incorporates by reference Paragraphs 1 through 83 above as if fully set forth herein.

98.     Plaintiff entered into a contract of insurance with Defendants; here, the Policy.

99.     As an insurer, Defendants have a duty of good faith and fair dealing towards its insureds, including the obligation to pay for the financial losses suffered by the Plaintiff and members of the Class because of the Mandated Shutdown Rules.

100.    Plaintiff and members of the Class had a reasonable expectation that the financial losses suffered because of the Mandated Shutdown Rules would be covered under the Policy.

101.    The Class members entered into a substantially identical policy with Defendants.

102.    Under the Policy, Defendants agreed to indemnify Plaintiff and the Class for their business losses as a result of a covered loss.

103.    Plaintiff and the Class members suffered a covered loss under the Policy.

104.    Plaintiff and the Class members timely submitted a notice of claim and satisfied all conditions precedent to receiving the coverage it purchased from Defendants.

105.    Defendants breached their contract with Plaintiff and the Class members by failing and refusing to provide the contracted for coverage.

106.    Defendants' breach of the contract has caused Plaintiff and the Class to suffer damages in the amount of their unreimbursed business losses or their limits of liability, whichever is lower.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff herein pray as follows:

(a)    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

(b)    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(c)    For damages in an amount to be determined by the trier of fact;

(d)    For an order of restitution and all other forms of equitable monetary relief;

(e)    Awarding Plaintiff's reasonable attorneys' fees, costs, and expenses;

(f)    Awarding pre- and post-judgment interest on any amounts awarded; and

(g)    Awarding such other and further relief as may be just and proper

## TRIAL BY JURY IS DEMANDED

A jury trial is demanded on all claims so triable.

Respectfully submitted,

Date:   May 7, 2021

*/s/ Gary F. Lynch*

Gary F. Lynch
Kelly K. Iverson
**CARLSON LYNCH LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
P: (412) 322-9243
F: (412) 231-0246
glynch@carlsonlynch.com
kiverson@carlsonlynch.com

*Counsel for Plaintiff*